# Richmond

## W. W. Moody v. R. G. Farinholt.

March 24, 1932.

Present, Holt, Epes, Hudgins, Gregory and Chinn, JJ.

The opinion states the case.

*W. D. Evans* and *Charles S. Smith, Jr.*, for the plaintiff in error.

*Lewis Jones* and *W. M. Minter*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

In this action plaintiff, W. W. Moody, charges the defendant, R. G. Farinholt, with trespassing upon his land and with cutting and removing timber. The defendant admitted the cutting, but said that it was on his own land and not on land owned by the plaintiff. There was a verdict and judgment for the defendant.

This is not a case of overlapping grants, patents or deeds. These lands admittedly border on each other and so it is only necessary to locate their common boundary.

Prior to 1825, William Robinson owned a farm in Middlesex county, containing about 232 acres. It was bounded on the south by the Piankatank river, on the east by Shooters Hill farm, and on the north by Carter Braxton's mill pond. After his death it was divided into lots and sold. One of them containing 105 acres was bought by George Healy, and by him sold to William T. Fauntleroy. The deed therefor of date November 24, 1825, has in it this description:

"Bounded as followeth by large ditch being the line between this tract and that called Shooters Hill, by the Piankatank and the Mill creek making to the Mill known by the name of Grymes upper Mill creek, now the property of Carter Braxton, being lots No. 1, 2 and 4 as particularly described and laid down in a plat and division of the real estate of Wm. Robinson returned by commissioners and recorded in the county court of Middlesex in a suit in chancery."

The lot to the north of this 105 acre lot came into the

hands of Henry C. Palmer and was by him conveyed to said Fauntleroy by deed of date the 4th day of February, 1829. It is there described as being "near Piankatank river containing forty-two and a half acres, and bounded as followeth by a large ditch on the southeast being the line between this tract and that called Shooters Hill on the north and south by the said Fauntleroy's land on the west by Mr. Carter Braxton's upper Mill creek."

James U. Wood acquired title to the lot north of the Palmer lot and by deed of June 6, 1826, conveyed it to Fauntleroy. It contains forty-two acres and is bounded as follows:

"Beginning at a Chestnut tree near Carter Braxton's Mill on the bank of the pond, thence across said Mill bounds, which is herein excepted unto the run then down by the meanders of the said Mill run until opposite a Chestnut tree on the declivity of the hill thence up the hill to another chestnut tree, thence across the field by a line of marked trees to a corner on a ditch thence along said ditch by a line of marked trees to the public road, thence across said road to a corner cedar post. Thence along by a line of marked trees to the beginning chestnut tree on the bank of the mill pond."

From this it appeared that Fauntleroy had acquired title to all of the William Robinson land except the north Hale and Blake lot, containing forty-two acres. Their general location is shown by a plat incorporated into this opinion, which, however, does not purport to be accurate.

It will be noted that each of said three lots, as they reached their eastern limit, pinned that line to that ditch, which is on the western limit of Shooters Hill. To it Fauntleroy took title by deed of date December 4, 1837, and thus became the owner of these two estates less the north forty-two acre lot.

In that deed and in the Northam survey is this description of this western boundary:

"Down the meanders of aforsd swamp (Rose's swamp) 124 poles and fifteen links to 8 an ash in the middle of Carter Braxton's mill pond, corner to this and Austin Blakes land, thence south twenty-three degrees, west twenty-one

poles and ten links to 9 a Cedar on the west side of small swamp; thence south thirty-nine and one half, west 292 poles to 10 the head of a fresh water stream thence south sixty-seven and one half degrees, west thirty poles to 11, where said stream empties into Piankatank river thence along the meanders of the river shore."

This is taken from a survey made by George Northam in 1837, and is conceded to be correct.

Plaintiff now owns Shooters Hill and if the cut-over land is a part of that estate he must prevail. The defendant controls this north lot of forty-two acres sometimes described as the Hale and Blake lot. If this cut-over land is there situate the judgment must stand.

W. F. O'Hara, a civil engineer introduced as a witness on behalf of the plaintiff has undertaken to establish this west line of Shooters Hill, and since that west line is a part of the Northam survey, it was of course necessary for him to re-trace it. He said that he examined the original, which is of record, and some older deed on which it was in a measure based. The ash tree in the center of Carter Braxton's mill pond is gone. At what is described as "a cedar at the west side of a small swamp" he found a cove or branch making into the mill pond, and the remains of a large dead cedar tree. He also found a rotten cedar stob where that line crossed the public road. Projected, this line reached the head of a fresh water stream running into the Piankatank river.

"The witness further stated that in running this western boundary line of Shooters Hill he went down a ditch a portion of the way which was at places three or four feet deep now and three or four feet wide. This was evidently an old ditch because there were large trees growing on the bottom of the ditch some of them being as much as two feet across the stump; that he got the present course of the line from 9 to 10 as shown on said blue print by the usual methods of calculating the magnetic variation since 1837."

That line in the Fauntleroy deed of 1837 runs south thirty-nine and one half degrees west. O'Hara found it to be now south forty-three degrees forty-eight minutes west, which is about what would have been expected, making allowance for magnetic variation. With allowances so made

it is practically parallel with the eastern boundary of Shooters Hill, which boundary is definitely marked by monuments. By the Northam survey these two lines vary in bearing by only one and one-half degrees.

The ash tree is gone but the O'Hara line starts or ends at what was estimated to be the center of Braxton's mill pond. Austin Blake's land cornered at this tree also—Northam so states; and that land is a part of the William Robinson land or of the north forty-two acre lot. The remains of a dead cedar tree on the west bank of a cove or swamp may not be the cedar tree which was standing in 1837, but it is significant that it was found where it might be expected to be. The ditch down which the line in part ran is a monument that stood in 1837, and stood when the Robinson lands were divided. The fresh water stream which ran into the Piankatank river still runs and this line reached its head as might have been expected. Moreover, the north end of this line is in the mill pond and not in Rose's swamp which makes into it.

This witness further states that he was shown a line run by a Mr. W. H. Stiff for the plaintiff in 1928. This line extends from Rose's swamp to the public road and is plainly marked by stobs still standing. Projected, it passes well to the east of the ditch, and ends in the Piankatank river, nowhere near the head of any fresh-water stream. Its bearing approximates that of the O'Hara line.

Stiff appears to have run another line in 1929, still further to the east, extending from Rose's swamp to the public road. Its bearing is south forty-nine degrees, fifteen minutes west, likewise fixed by stobs. It, projected, runs still further to the east of this ditch, reaches nowhere near the headwaters of any running stream, has excess magnetic variations and differs substantially in its bearings from the east boundary of Shooters Hill.

Mr. Stiff, however, says that he ran but one line for Mr.

Moody, the other was merely experimental. He was at one time county surveyor of Middlesex county and has testified as a witness on behalf of the defendant.

He also has prepared an elaborate plat showing the line in judgment. His plat covers the entire Farinholt estate, consisting of about 711 acres, most of which is north of the mill pond, but a part of it is to the south and takes in the Hale and Blake lot. In its preparation he examined other recorded surveys of Shooters Hill and of adjacent estates. This manner of work is common with surveyors and is at times indispensable. In these surveys this witness says he came across established monuments which verified their correctness and which enabled him to fix with certainty the line in judgment. It, as fixed by him, runs from a cedar stob near the center of Rose's swamp to one on its bank and thence to another stob. The bearing of this line cannot be stated with certainty from this map, but conforms generally to that of the Northam survey. These three stobs, the one in the center of the swamp, the one up upon its bank, and the other a short distance therefrom, are about 100 feet apart. From this last, 583 feet away, is another cedar stob on the north side of the public road. The bearing of this last line is south forty-two degrees. He has also filed the original.plat which he made for Moody, in which its bearing appears to be either south forty-two degrees west, or fifty-four and one-half degrees west. Just which is intended is not plain. He probably intended to say forty-two degrees, for fifty-four would be plainly wrong.

We have seen that the Northam line is the true division line. It begins at "an ash in the middle of Carter Braxton's mill pond." The ash is gone but the mill pond is there. The Stiff line, in his present survey, does not begin in the mill pond at all but at a cedar stob above its head and in Rose's swamp. This point of departure is wrong. It should run to "a cedar on the west side of a small swamp."

This monument is nowhere mentioned. It is true that there are three small swamps or coves which make into the pond. Certainly it should reach to the west side of one of them, but it is well to the east of them all. Extended, it should reach "the head of a fresh water stream" flowing into the Piankatank river. This it could not possibly do, for Stiff states that it would pass 600 feet to the east of the old line ditch. If it touched any water at all before reaching the river it would not be this fresh-water stream but a goose pond fed by an artesian well.

█ All of this violates one of the fundamentals of surveying. It neither touches nor purports to touch one of the landmarks or monuments on the Shooters Hill line, although some of them are as plain today as they were in 1837. Established, they fix this line, and so established, it cannot possibly be changed by the lines of other surveys. No amount of evidence can change a right line from A to B where A and B are ascertained monuments. The ditch of itself, down which the O'Hara line runs, is enough.

Here we have no question of adversary possession and no principle of estoppel can be invoked. Other surveys cannot change it nor can the evidence of witnesses as to the conduct of these landholders and of their predecessors in title. In such circumstances no collateral evidence to support a change has probative value. Faith may move mountains, but neither oral evidence nor ancient surveys have yet shifted a monument once established and still standing.

█ If we were undertaking as an original proposition to establish this Shooters Hill line ancient surveys might be of value, but that is not this case. Since the Northam survey is conceded to be correct, it, when re-established, whether right or wrong, ends our inquiry. Evidence on which the defendant rests his case might well have been stricken out,

and since it might have been stricken out, it cannot be considered on a motion to set aside his verdict.

Of course, if upon a re-examination, it appears that any of the cut-over land lies west of the Northam line as here fixed, then for it plaintiff cannot recover. He is only entitled to damages for timber cut east of it.

Although of no moment in the present case, it may be said in passing that one judge presided at the trial below. Another on motion to set aside the verdict, gave final judgment. He neither saw the witnesses nor heard them testify.

For reasons stated the judgment of the lower court is set aside and this case is remanded for such further action as may be proper in the premises.

*Reversed.*